Evan J. Smith
BRODSKY & SMITH
240 Mineola Boulevard
First Floor
Mineola, NY 11501
Telephone: 516.741.4977
Facsimile: 516.741.0626
esmith@brodskysmith.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HUDSON RIVER PROTECTION, LLC D/B/A FRIENDS OF THE HUDSON RIVER,<br>Plaintiff,<br>vs.<br>LAMOTHERMIC CORP.,<br>Defendant. | **Case No.: 7:26-cv-08334**<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**<u>JURY TRIAL DEMAND</u>** |

Plaintiff, Hudson River Protection, LLC d/b/a Friends of the Hudson River ("Plaintiff" or "FOTHR"), by and through its counsel, alleges as follows:

1. This is a citizen suit, brought pursuant to the Section 505(a)(1) of the Federal Water Pollution Control Act (the "Clean Water Act" or "CWA"), 33 U.S.C. § 1365(a)(1), to address violations of the CWA by Defendant Lamothermic Corp. ("Lamothermic" or the "Defendant") arising out of operations at Lamothermic's facility located at 391 Route 312, Brewster, NY 10509 (the "Facility").

2. Since at least July 23, 2023, Defendant has been discharging and continues to discharge polluted stormwater from the Facility in violation of the express terms and conditions

of Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1311, 1342 and in violation of the New York State Department of Environmental Conservation ("NYSDEC") State Pollutant Discharge Elimination System ("SPDES") Multi-Sector General Permit for Discharges of Stormwater Associated with Industrial Activity (the "General Permit") issued by the State of New York.

3. Plaintiff seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorneys' and expert witness fees, for Defendant's repeated and ongoing violations of the CWA.

**JURISDICTION AND VENUE**

4. This Court has subject matter jurisdiction over the parties and subject matter of this action pursuant to Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), 28 U.S.C. § 1331 (an action arising under the laws of the United States), and 28 U.S.C. § 2201 (declaratory relief).

5. On July 23, 2026, as required by the CWA, 33 U.S.C. § 1365(b)(1)(A), Plaintiff provided notice of intent to file suit against Defendant for CWA violations ("Notice Letter") to the Administrator of the United States Environmental Protection Agency ("EPA"); the Regional Administrator of EPA Region II; the Regional Director of the NYSDEC – Region 3; the Commissioner of the NYSDEC (collectively, "State and Federal Agencies"); and Defendant.

6. The Notice Letter provided Defendant with sufficient information to determine (i) the CWA requirements Plaintiff alleges Defendant violated, (ii) the activity alleged to constitute the violation(s), (iii) sufficient information to determine the date, location, and person responsible for the violation(s), and (iv) the contact information for the Plaintiff and Plaintiff's Counsel. A copy of the Notice Letter is attached as Exhibit 1.

7. More than sixty (60) days have passed since the Notice Letter was served on Defendant and the State and Federal Agencies. During this time, neither the EPA, nor the State of

New York, has commenced or is diligently prosecuting a court action to redress the violations alleged herein. No claim in this action is barred by any prior administrative action pursuant to Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

8. Venue is proper in the Southern District of New York pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

**PARTIES**

9. Plaintiff is an organization established to protect the watersheds located within the Mid-Hudson Region of New York. Plaintiff and its members are concerned with the environmental health of an Unnamed Tributary East Branch Croton, Croton River, New Croton Reservoir, the Hudson River, and its members use and enjoy the waters of the Unnamed Tributary East Branch Croton, Croton River, New Croton Reservoir, the Hudson River, their inflows, outflows, and other areas of the overall Hudson River Watershed, into which the stormwater discharges from the Facility flow. Plaintiff's members use and enjoyment of these waters is negatively affected by the pollution caused by Defendant's operations. Plaintiff and its members are dedicated to protecting the water quality of an Unnamed Tributary East Branch Croton, Croton River, New Croton Reservoir, the Hudson River, and its members use and enjoy the waters of the Unnamed Tributary East Branch Croton, Croton River, New Croton Reservoir, the Hudson River, their inflows, outflows, and other areas of the overall Hudson River Watershed, for the benefit of its ecosystems and communities. To further these goals, Plaintiff actively seeks federal and state agency implementation of the CWA, and, where necessary, directly initiates enforcement actions on behalf of itself and for its members and community.

10. Plaintiff's members, like other citizens, taxpayers, property owners, and residents of its community, live, work, travel near, and recreate in close proximity to the Unnamed Tributary

East Branch Croton, Croton River, New Croton Reservoir, the Hudson River, and its members use and enjoy the waters of the Unnamed Tributary East Branch Croton, Croton River, New Croton Reservoir, the Hudson River, their inflows, outflows, and other areas of the overall Hudson River Watershed, of which the Unnamed Tributary East Branch Croton, Croton River, New Croton Reservoir, and the Hudson River are a part, and into which Defendant discharges pollutants. Plaintiff's members, like other citizens, taxpayers, property owners, and residents, use and enjoy the Unnamed Tributary East Branch Croton, Croton River, New Croton Reservoir, the Hudson River, and its members use and enjoy the waters of the Unnamed Tributary East Branch Croton, Croton River, New Croton Reservoir, the Hudson River, their inflows, outflows, and other areas of the overall Hudson River Watershed, of which the Unnamed Tributary East Branch Croton, Croton River, New Croton Reservoir, and the Hudson River are a part, for recreational, educational, scientific, conservation, aesthetic, spiritual, and other purposes. Defendant's discharge of stormwater containing pollutants impairs each of these uses. Thus, Plaintiff's members' interests have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the CWA and the General Permit.

11. Plaintiff's members enjoy going to parks adjacent to the affected waters. Plaintiff's members enjoy relaxing in and around and traversing through the areas adjacent to the affected waters.

12. Plaintiff's members have witnessed the polluted nature of the Unnamed Tributary East Branch Croton, Croton River, New Croton Reservoir, and the Hudson River. Plaintiff's members have observed that the Unnamed Tributary East Branch Croton, Croton River, New Croton Reservoir, and the Hudson River appear both brown and dirty. In addition to its visual observation of the water, Plaintiff's members have also noticed an unpleasant smell coming from the waters.

13. Plaintiff is aware that Defendant's Facility is upstream and that the pollution from the Facility flows downstream into the Unnamed Tributary East Branch Croton, Croton River, New Croton Reservoir, and the Hudson River. Plaintiff believes that this has degraded the beauty of the adjacent area and curtailed its members' enjoyment of the adjacent area.

14. Plaintiff's members believe that reducing Defendant's pollution of the Unnamed Tributary East Branch Croton, Croton River, New Croton Reservoir, and the Hudson River will improve the water quality in the Unnamed Tributary East Branch Croton, Croton River, New Croton Reservoir, and the Hudson River and allow its members the opportunity to better enjoy the recreational and aesthetic interests in the Unnamed Tributary East Branch Croton, Croton River, New Croton Reservoir, the Hudson River, and the parks near to these waters.

15. Defendant Lamothermic is organized under the laws of the State of New York with its listed principal place of business as 391 Route 312, Brewster, NY 10509.

16. Defendant owns and operates the Facility, located at 391 Route 312, Brewster, NY 10509.

17. The Facility operates as, amongst other things, an investment casting facility. Other activities likely carried out in the regular course of business at the Facility include storage of raw materials, maintenance, equipment storage, and other industrial operations exposed to stormwater. Repair and maintenance activities carried out at the Facility include, but are not limited to, electrical, mechanical, structural, and general facility maintenance.

18. The Facility's industrial activities fall under Standard Industrial Classification ("SIC") Codes 3324, 3366, and 3369, relating to steel investment foundries, copper foundries and nonferrous foundries respectively, requiring the Facility to obtain coverage under the General Permit. See, General Permit, Part VII, Sector F, p. 61 – 63. In or around September 2012, Defendant applied for and received coverage under New York's SPDES General Permit (Permit

No. NYR00F486).

## REGULATORY BACKGROUND

***The Problem of Stormwater Pollution***

19. Stormwater runoff is one of the most significant sources of water pollution in the nation and has been recognized as a leading cause of significant and cumulative harmful impacts to the water quality of the Unnamed Tributary East Branch Croton, Croton River, New Croton Reservoir, the Hudson River, their tributaries, and the overall Hudson River Watershed, of which the Unnamed Tributary East Branch Croton, Croton River, New Croton Reservoir, and the Hudson River are a part. With every rainfall event, significant amounts of polluted rainwater flow from local industrial facilities, such as the Facility, and pour into storm drains, local tributaries, and into the Unnamed Tributary East Branch Croton, Croton River, New Croton Reservoir, the Hudson River, their tributaries, and the overall Hudson River Watershed, of which Unnamed Tributary East Branch Croton, Croton River, New Croton Reservoir, and the Hudson River are a part.

20. Stormwater runoff from industrial sites such as the Facility causes harm to humans and aquatic life. In particular, stormwater can contain heavy metal pollutants such as aluminum, chromium, copper, iron, lead, mercury, nickel, tin, and zinc, as well as high concentrations of suspended solids, and nitrate plus nitrite nitrogen. Exposure and ingestion of heavy metals can cause health problems in people and aquatic animals, including neurological, physiological, and reproductive effects. Heavy metals have been shown to alter activity in tissues and blood of fish.

21. High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS has been shown to alter predator/prey relationships (for example, turbid water might make it difficult for fish to see their prey). Deposited solids alter habitat for fish, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and

polycyclic aromatic hydrocarbons ("PAHs"), are absorbed onto TSS. Thus, higher concentrations of TSS mean higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces.

***The Clean Water Act***

22. The CWA prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated CWA requirements. Section 301(a), 33 U.S.C. § 1311(a) Among other things, CWA Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.

23. The CWA requires that NPDES permits be issued for stormwater discharges "associated with industrial activity" to a point source. CWA Section 402(p), 33 U.S.C. § 1342(p).

24. The "discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

25. The CWA, Section 301(b), required that, by March 31, 1989, all point source dischargers, including those discharging polluted stormwater must achieve technology based effluent limitations by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

26. The United States District Court for the Southern District of New York has held that "the Clean Water Act deems compliance with an SPDES permit to be compliance for enforcement purposes, 33 U.S.C. § 1342, and conversely, noncompliance with a permit violates the Act itself and constitutes grounds for liability. *Borough of Upper Saddle River, N.J. v. Rockland*

*Cnty. Sewer Dist. #£1*, 16 F. Supp. 3d 294, 300–01 (S.D.N.Y. 2014); *citing, Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 174, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); *see also* 40 C.F.R. § 122.41(a) (requiring that the permittee comply "with all conditions of this permit ... [a]ny permit noncompliance constitutes a violation of the Clean Water Act" (emphasis added)); *Humane Soc. of U.S. v. HVFG, LLC*, No. 06 Civ. 6829(HB), 2010 WL 1837785 (S.D.N.Y. May 18, 2010) (finding liability for failure to satisfy reporting requirements of SPDES permit).

27. Pursuant to this strict liability regime, neither the CWA nor its implementing regulations contain an exception for "de minimis" violations. *See Alabama Power Co. v. Costle*, 636 F.2d 323, 360 (D.C. Cir. 1979); *Hawaii's Thousand Friends v. City & Cty of Honolulu*, 821 F. Supp. 1368, 1392 (D. Haw. 1993) (noting that the CWA does not excuse de minimis violations).

28. CWA Section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. § 1365(a)(1), see 33 U.S.C. § 1362(5).

29. CWA Section 505(a) authorizes a citizen suit action for injunctive relief. 33U.S.C. § 1365(a).

30. CWA violators are subject to an assessment of civil penalties for violations occurring after November 2, 2015, the CWA imposes civil penalty liability of up to $66,712 per day per violation for penalties assessed on or after December 27, 2023, but before January 8, 2025, and up to $68,445 per day per violation for penalties assessed on or after January 8, 2025. 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4. 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4.

***State Regulations***

31. CWA Section 402(b), 33 U.S.C. § 1342(b), allows each state to administer its own

EPA approved permit program for discharges. New York was delegated the authority to administer the NPDES program in 1975.

32. In New York, the NYSDEC, has approval from the EPA to administer an SPDES permit program for the state. The NYSDEC issues general SPDES permits regulating water pollutant discharges from various categories of dischargers.

33. New York law defines "pollution" as:

> The Presence in the environment of conditions and/or contaminants in quantities of characteristics that are or may be injurious to human, plant or animal life or to property or that unreasonably interfere with the comfortable enjoyment of life and property throughout such areas of the State as shall be affected thereby.

*See* 6 Compilation of the Rules and Regulations of the State of New York ("NYCRR") Part 700.1.a.47.

34. ECL § 17-0501 makes it unlawful for any person to discharge into the waters of the state organic or inorganic matter that shall cause or contribute to a condition in contravention of the water quality standards adopted by the DEC.

35. Under New York law, no person shall discharge or cause a discharge of any pollutant without a SPDES permit having been issued to such person pursuant to this Part and ECL article 17, title 7 or 8, with respect to such discharge; and no person shall discharge or cause a discharge of any pollutant in a manner other than as prescribed by such permit. See 6 NYCRR Part 750-1.4.a.

36. Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards ("WQS"), including water quality objectives and beneficial uses for navigable waters of the United States. The CWA prohibits discharges from causing or contributing to a violation of such state WQS. *See* 33 U.S.C. § 1311(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. § 122.44(d)(1).

37. New York regulates water quality through water quality standards and classifications codified at Title 6 of the New York Codes, Rules and Regulations ("NYCRR"), Parts 700 through 757. These standards include both narrative criteria — prohibiting, among other things, visible deposits, turbidity, oil and grease producing a sheen, and substances harmful to aquatic life — and designated best use requirements requiring that waters be suitable for their intended uses, including aquatic life and recreational uses. See, e.g., 6 NYCRR §§ 701.1 et seq., 703.2.

38. New York law prohibits permittees from causing or contributing to violations of water quality standard. *See* General Permit, Part II(C)(1)(a) ("It must be a violation of the Environmental Conservation Law (ECL) for any discharge authorized by this general permit to either cause or contribute to a violation of water quality standards as contained in 6 NYCRR Parts 700-705."); General Permit, Part II(C)(1)(c) ("In all cases, any discharge which contains a visible sheen, foam, or odor, or may cause or contribute to a violation of water quality is prohibited.").

***The General Permit***

39. Section 402 of the CWA establishes the NPDES program, which allows EPA and states acting under delegated authority to issue NPDES permits for the discharge of pollutants from a point source. 33 U.S.C. § 1342. Any person who discharges a pollutant must apply for a NPDES permit unless they are exempt under the statute or the EPA regulations implementing it. *See* 40 C.F.R. § 122.21(a).

40. The General Permit is an SPDES permit issued pursuant to CWA Section 402(p), 33 U.S.C. § 1342(p).

41. The General Permit's Discharge Prohibitions prohibits any discharge that may cause or contribute to a violation of New York's water quality standard. *See* General Permit, Part II(C)(1)(c).

42. On or about March 8, 2023, the NYSDEC adopted an updated SPDES General Permit for Discharges of Stormwater Associated with Industrial Activity. The changes made in the updated General Permit were adopted to be consistent with the United States EPA's Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (the "MSGP") that was reissued and updated in 2018. As of approximately March 8, 2023, the General Permit has superseded and rescinded the Previous General Permit except for purposes of enforcement actions brought pursuant to the prior permit.

43. The General Permit is intended to provide NPDES permit coverage for discharges of stormwater associated with industrial activity, as defined at 40 CFR § 122.26(b)(14) (excluding §§ 122.26(b)(14)(iii) for mineral industry, 122.26(b)(14)(ix) for sewage treatment works and 122.26(b)(14)(x) for stormwater associated with construction activity).

44. Under the CWA and/or the General Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate stormwater pollution. 33 U.S.C. § 1311(b); General Permit, Part II. The EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. Final National Pollutant Discharge Elimination System (NPDES) General Permit for Stormwater Discharges from Industrial Activities ("Multi-Sector Permit"), 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000); Multi Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); Multi Sector Permit, 80 Fed. Reg. 34,403 (June 16, 2015). These benchmark values are identified in the General Permit and its sector-specific requirements, including Sector F (Primary Metals).

45. The Effluent Limitations of the General Permit prohibit the discharge of pollutants from the Facility in concentrations above the level commensurate with the application of BMP specified at General Permit, Part II, and in the sector specific permit requirements in the General

Permit, Part VII, which are consistent with the sector specific effluent limitations contained in the EPA MSGP. These benchmark values are reiterated and incorporated into the General Permit. *See* General Permit, Part VII.

46. The General Permit requires dischargers to develop and implement an adequate Stormwater Pollution Prevention Plan (a "SWPPP"). *See* General Permit, Part III. The General Permit also requires dischargers to review and if necessary, amend the SWPPP whenever: (1) There is a change in design, construction, operation, or maintenance at the facility which may have an effect on the potential for the discharge of pollutants from the facility which has not otherwise been addressed in the SWPPP; or (2) Site inspections or monitoring required in Part IV reveal that the chosen BMPs are found to be ineffective in eliminating or significantly minimizing pollutants from sources identified under Part III(A)(3) or is otherwise not achieving the goals or requirements of this permit. *See* General Permit, Part III(E).

47. The SWPPP must include, among other requirements, the following: information related to a discharger's stormwater pollution prevention team; a general site description; a summary of potential pollutant sources; measures related to handling of spills and releases; a general location map and a site map identifying the location of the facility and all receiving waters to which stormwater discharges; a description of control measures and best management practices; schedules and procedures for implementation of control measures, monitoring and sampling, and inspections; and documentation of inspections, samples, and corrective actions taken at a facility. *See* General Permit, Part III(A).

48. The General Permit requires facility operators to develop and implement a Stormwater Monitoring Program. *See* General Permit, Part IV. The General Permit requires that facility operators create and implement a Stormwater Monitoring Program to ensure that each of a facility's stormwater discharges comply with the Discharge Prohibitions and Effluent

Limitations specified in the General Permit. Facility operators must ensure that their Stormwater Monitoring Program practices reduce or prevent pollutants in stormwater and authorized non-stormwater discharges as well as evaluate and revise their practices to meet changing conditions at the facility. *Id.* This may include revising the SWPPP as required by General Permit, Part III(E).

49. The Stormwater Monitoring Program must measure the effectiveness of BMPs used to prevent or reduce pollutants in stormwater discharges, and facility operators must revise the Stormwater Monitoring Program whenever appropriate. *See* General Permit, Part III(A). The General Permit requires facility operators to monitor and collect samples of stormwater discharges from all outfall areas identified as such. *Id.* Facility operators are also required to provide an explanation of monitoring methods describing how a facility's monitoring program will satisfy these objectives. *Id.*

50. The General Permit requires industrial discharges to monitor their facilities, sample discharges, and submit complete and accurate report to NYSDEC. *See* General Permit, Part IV, VI, Appendices H(8)(g), H(9). The required reporting includes an annual report and periodic discharge monitoring reports. *See* General Permit, Part VI(A)(1) and (A)(2). Additionally, when there is an exceedance of a numeric effluent limit or of a benchmark that applies to the impairing pollutant discharged to an impaired waterbody, a discharger must report on the exceedance event and corrective actions taken in response. *See* General Permit, Part VI(A)(2)(b).

51. Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements. 33 U.S.C. §§1365(a)(1) and (f), § 1362(5). An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties for violations occurring after November 2, 2015, the CWA

imposes civil penalty liability of up to $66,712 per day per violation for penalties assessed on or after December 27, 2023, but before January 8, 2025, and up to $68,445 per day per violation for penalties assessed on or after January 8, 2025. 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4. 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4.

## STATEMENT OF FACTS

***Facility Description***

52. Plaintiff, through its counsel, has conducted a detailed investigation of the Facility operated by the Defendant at 391 Route 312, Brewster, NY 10509.

53. The Facility is regulated by the General Permit.

54. The Facility operates as an investment casting, fall under Standard Industrial Classifications ("SIC") Codes 3324, 3366, and 3369, all of which fall under Sector F (Primary Metals), and is therefore regulated by the General Permit. Defendant is covered under the General Permit, Permit No. NYR00F486.

***Activities Resulting in Polluted Stormwater Runoff***

55. Operations at the Facility generally include, but are not limited to, investment casting. Such other activities likely carried out in the regular course of business at the Facility include storage of raw materials, maintenance, equipment storage, and other industrial operations exposed to stormwater. Repair and maintenance activities carried out at the Facility include, but are not limited to, electrical, mechanical, structural, and general facility maintenance.

56. Certain operations at the Facility occur outdoors and are causing pollutants to be exposed to rainfall.

57. Specifically, Plaintiff's investigation has documented industrial processes at the Facility exposed to stormwater, including, but not limited to:

a. The storage of industrial machinery and products outdoors and not under cover, and

exposed to stormwater, including:

i. Piles of wood pallets left uncovered and exposed to rainfall;

ii. Piles of scraps left unovered and exposed to rainfall;

iii. Dumpsters left uncovered and exposed to rainfall;

iv. Trucks and other trailers; and

v. Refuse.

b. The carrying out of industrial processes outdoors and not under cover, including including hull maintenance, sanding, scraping, painting, and pressure washing, and the use of the list of industrial machinery and products mentioned above.

58. Vehicles and equipment at the Facility expose many other sources of pollution to the elements, including gasoline, diesel fuel, anti-freeze, battery fluids, and hydraulic fluids.

59. The types of pollutants released by the Facility into the immediate environment are known to include, or have the potential to include, among other contaminants; Total Recoverable Aluminum, Total Suspended Solids ("TSS"), Total Recoverable Copper, Total Recoverable Iron, Total Recoverable Zinc, waste oils, lubricants, fuel, trash, debris, hazardous materials, and other pollutants.

60. The industrial materials stored, and the pollutants generated at the Facility are exposed to stormwater flows.

61. Activities at the Facility generate significant debris and particulate matter, which contain pollutants that settle on surfaces within the Facility. During rain events, this pollution washes off those surfaces and flows via direct flow into an Unnamed Tributary East Branch Croton, Croton River, New Croton Reservoir, and the Hudson River. The polluted stormwater discharges from the Facility, flows via direct flow into an Unnamed Tributary East Branch Croton, Croton River, New Croton Reservoir, the Hudson River and the overall Hudson River Watershed,

before eventually reaching the New York Harbor and the Atlantic Ocean.

***Activities Contributing to CWA Violations***

62. It is clear that Defendant has materially failed to comply with numerous aspects of the General Permit, and as such, has been in constant violation of the General Permit since at least July 23, 2023.

63. Defendant has not developed and/or implemented an adequate SWPPP at the Facility.

64. Defendant has not developed and/or implemented BMPs that adequately minimize the exposure of pollutants to stormwater at the Facility.

65. Defendant has not developed and/or implemented BMPs at the Facility that adequately control and minimize polluted runoff from the Facility.

66. Defendant has not developed and/or implemented BMPs at the Facility that adequately treat and remove pollutants in stormwater prior to discharge.

67. Defendant has not developed and/or implemented adequate measures to reduce or eliminate stormwater pollution that constitute BAT/BCT.

68. Defendant has not developed and/or implemented adequate BMPs at the Facility to achieve stormwater discharges that meet EPA Benchmarks or applicable Water Quality Standards.

69. Defendant has not adequately evaluated and revised the Facility's SWPPP to address these failures. Defendant has also failed to properly operate and maintain the structures and systems that have been put in place at the Facility to achieve compliance with the General Permit and its SWPPP requirements.

70. Defendant has not developed and/or implemented an adequate Stormwater Monitoring Program at the Facility which has resulted in practices that do not adequately reduce or prevent pollutants from discharging from the stormwater flows from the Facility.

71. Defendant's monitoring activities, or lack thereof, have not effectively identified compliance problems at the Facility or resulted in effective revisions of the SWPPP.

72. Due to Defendant's lack of effective pollution prevention measures, including effective BMPs, and its failure to implement an effective monitoring and reporting program, stormwater from the Facility becomes polluted with many constituents. The potential pollutants from the Facility include among other contaminants; Total Recoverable Aluminum, Total Suspended Solids ("TSS"), Total Recoverable Copper, Total Recoverable Iron, Total Recoverable Zinc, waste oils, lubricants, fuel, trash, debris, hazardous materials, and other pollutants. Stormwater from the Facility discharges, via the local storm sewer system and/or surface runoff, directly into an Unnamed Tributary East Branch Croton, Croton River, New Croton Reservoir, the Hudson River, and the overall Hudson River Watershed, of which the Unnamed Tributary East Branch Croton, Croton River, New Croton Reservoir, and the Hudson River are a part.

73. Polluted stormwater is discharged from the Facility into the Unnamed Tributary East Branch Croton, Croton River, New Croton Reservoir, the Hudson River and the overall Hudson River Watershed, of which the Unnamed Tributary East Branch Croton, Croton River, New Croton Reservoir, and the Hudson River are a part. The Unnamed Tributary East Branch Croton, Croton River, New Croton Reservoir, the Hudson River, their inflows and outflows, and other areas of the overall Hudson River Watershed are waters of the United States.

74. The issues at Defendant's Facility have persisted since at least July 23, 2023.

75. The testing submitted by Defendant has, in every reporting period since at least January 2023, indicated multiple benchmark value exceedances occurring at the Facility's outfalls for pollutant parameters it is required to monitor per the General Permit.

76. Specifically, in the six (6) month reporting periods of January 1, 2026 through June 30, 2026; July 1, 2025 through December 31, 2025; July 1, 2024 thorugh December 31, 2024;

January 1, 2024 through June 30, 2024; and January 1, 2023 through June 30, 2023, the Facility reported monitoring data showed benchmark exceedances for the pollutant parameters of Total Recoverable Aluminum. The exceedances for Total Recoverable Aluminum were as much as 10 times the General Permit's listed benchmark limit.

77. Specifically, in the six (6) month reporting periods of January 1, 2026 through June 30, 2026; and July 1, 2025 through December 31, 2025, the Facility reported monitoring data showed benchmark exceedances for the pollutant parameter of Total Suspended Solids. The exceedences for Total Suspended Solids were as much as 3 times the General Permit's listed benchmark limit.

78. Specifically, in the six (6) month reporting periods of January 1, 2026 through June 30, 2026; July 1, 2025 through December 31, 2025; January 1, 2025 through June 30, 2025; July 1, 2024 thorugh December 31, 2024; January 1, 2024 through June 30, 2024; July 1, 2023 through December 31, 2023; and January 1, 2023 through June 30, 2023, the Facility reported monitoring data showed benchmark exceedances for the pollutant parameters of Total Recoverable Copper. The exceedances for Total Recoverable Copper were as much as 10 times the General Permit's listed benchmark limit.

79. Specifically, in the six (6) month reporting periods of January 1, 2026 through June 30, 2026; July 1, 2025 through December 31, 2025; January 1, 2025 through June 30, 2025; July 1, 2024 thorugh December 31, 2024; January 1, 2024 through June 30, 2024; and January 1, 2023 through June 30, 2023, the Facility reported monitoring data showed benchmark exceedances for the pollutant parameters of Total Recoverable Iron. In many instances, the exceedances for Total Recoverable Iron were as much as 14 times the General Permit's listed benchmark limit

80. Specifically, in the six (6) month reporting periods of January 1, 2026 through June 30, 2026; July 1, 2025 through December 31, 2025; January 1, 2025 through June 30, 2025; July

1, 2023 through December 31, 2023; and January 1, 2023 through June 30, 2023, the Facility reported monitoring data showed benchmark exceedances for the pollutant parameters of Total Recoverable Zinc. The exceedances for Total Recoverable Zinc were as much as 7 times the General Permit's listed benchmark limit.

81. The exceedances set forth above are indicative of the Facility's failure to implement adequate BMPs to address it's the discharge of pollutants into waters of the United States such as the Unnamed Tributary East Branch Croton, Croton River, New Croton Reservoir, the Hudson River, their inflows and outflows, and other areas of the overall Hudson River Watershed.

82. Defendant has failed to implement BMPs that reduce or prevent discharges of pollutants in its stormwater discharge in a manner that reflects best industry practice considering technological availability and economic practicability and achievability.

83. The Defendant has also violated the General Permit by failing to implement a SWPPP that complies with the General Permit's requirements. Notably, it appears there have been no PPC amendments or revisions despite continuous exceedances for several parameters at the Facility, which require a review and update of the SWPPP.

84. Significantly, the pollutants associated with SIC Codes 3324, 3366, and 3369 and Sector F are particularly dangerous to riverine ecosystems, including: (i) Total Recoverable Iron; (ii) Total Suspended Solids ("TSS"); (iii) Total Recoverable Copper; (iv) Total Recoverable Iron; and (v) Total Recoverable Zinc. It is therefore clear that the numerous stormwater discharges from the Facility containing higher than allowable levels of these pollutants pose an immediate danger to the Hudson River Watershed.

85. Due to these numerous insufficiencies, discrepancies, and overages contained in the Defendant's annual stormwater sampling, the Facility's discharges of stormwater have been, and are likely to continue to be regularly contaminated with higher levels of pollutants than are

consistent with BMPs that constitute BAT/BCT and are thus violative of the General Permit and CWA.

**FIRST CAUSE OF ACTION**

**Discharges in Violation of the Permit Prohibitions of the General Permit**
**(Violations of 33 U.S.C. §§ 1211, 1342)**

86. Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

87. The CWA and NYCRR prohibit any person from placing or causing to be placed, any industrial wastes or other wastes, in a location where they cause pollution of any waters of the state without a valid, unexpired permit. *See* 35 P.S. § 691.301; 35 P.S. § 691.611; 33 U.S.C. § 1311(a); *see also* 6 NYCRR Part 750-1.4.a.

88. The CWA and NYCRR prohibit any person from discharging any pollutant or causing, permitting, or allowing a discharge of any pollutant from a point source without applying for and obtaining a general or individual NPDES permit. *See* 33 U.S.C. § 1342; 6 NYCRR Part 750-1.4.a.

89. Since at least July 23, 2023, Defendant has been discharging polluted stormwater from the Facility in violation of the Prohibitions of the Industrial Stormwater Permit during every significant rain event (defined by EPA as a rainfall event generating 0.1 inches or more of rain). *See* Exhibit 1, NoV at Attachment 3.

90. The polluted stormwater discharged from the Facility during every significant rain event contains pollutants harmful to fish, plants, birds, and human health that have adversely affected, and continue to adversely affect, human health and the environment in violation of the Industrial Stormwater Permit.

91. Discharges of polluted stormwater from the Facility have in the past caused, and

will continue to cause, pollution, contamination, and/or nuisance to the waters of the United States in violation of the Industrial Stormwater Permit and the Water Quality Standards set forth in the Basin Plan.

92. Each day since at least July 23, 2023, that Defendant has discharged polluted stormwater from the Facility in violation of the Industrial Stormwater Permit is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a).

93. By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

94. An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff, for which harm he has no plain, speedy, or adequate remedy at law.

95. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## SECOND CAUSE OF ACTION

### Discharge in Violation of Effluent Limitations of the General Permit

96. Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

97. The General Permit's SWPPP requirements and effluent limitations require dischargers to reduce or prevent pollutants in their stormwater discharges through the implementation of measures that must achieve BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

98. Defendant has discharged and continues to discharge stormwater from the Facility in concentrations above the level commensurate with the application of BMP specified at General

Permit, Part II, and in the sector specific permit requirements in the General Permit, Part VII, which are consistent with the sector specific effluent limitations contained in the EPA MSGP during every significant rain event occurring from July 23, 2023, through the present. Defendant's failure to develop and/or implement BMPs adequate to achieve the pollutant discharge reductions at the Facility is a violation of the General Permit and the CWA. *See* General Permit, Part II; 33 U.S.C. § 1311(b).

99. Each day since at least July 23, 2023, that Defendant has discharged stormwater containing pollutants in violation of the General Permit, specifically *General Permit Sectors Generally*, is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

100. Defendant's CWA violations described in the paragraphs above will continue in the future until Defendant develops and implements BMPs at the Facility adequate to achieve pollutant discharge reductions attainable via BAT and BCT.

101. By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365.

102. An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff for which harm it has no plain, speedy, or adequate remedy at law.

103. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## THIRD CAUSE OF ACTION

### Failure to Develop and Implement an Adequate Preparedness, Prevention, and Contingency Plan, In Violation of the General Permit

104. Plaintiff incorporates the allegations contained in all other paragraphs as though

fully set forth herein.

105. The General Permit requires dischargers to develop and implement an adequate Stormwater Pollution Prevention Plan (a "SWPPP"). *See* General Permit, Part III. The General Permit also requires dischargers to review and if necessary, amend the SWPPP whenever: (1) There is a change in design, construction, operation, or maintenance at the facility which may have an effect on the potential for the discharge of pollutants from the facility which has not otherwise been addressed in the SWPPP; or (2) Site inspections or monitoring required in Part IV reveal that the chosen BMPs are found to be ineffective in eliminating or significantly minimizing pollutants from sources identified under Part III(A)(3) or is otherwise not achieving the goals or requirements of this permit. *See* General Permit, Part III(E).

106. Defendant, as of July 23, 2023, has commenced industrial activity and continues to conduct industrial activity at the Facility.

107. Defendant has failed and continues to fail to develop and implement an adequate SWPPP or implement all necessary revisions to the SWPPP for the Facility as required by the General Permit.

108. Defendant has failed and continues to fail to develop or implement a SWPPP for the Facility that includes BMPs adequate to meet the requirements of the General Permit, specifically General Permit, Part III.

109. Defendant has failed and continues to fail to adequately develop or implement a SWPPP at the Facility that prevents discharges from violating the Discharge Prohibitions, and Effluent Limitations of the General Permit.

110. Each day since July 23, 2023, that Defendant has failed to adequately develop and/or implement a SWPPP for the Facility in violation of the General Permit, is a separate and distinct violation of CWA Section 301(a), 33 U.S.C. § 1311(a).

111. Defendant has been in violation of the General Permit's SWPPP requirements every day since July 23, 2023. Defendant will continue to be in violation of the SWPPP requirements each day that Defendant fails to develop and fully implement an adequate SWPPP for the Facility.

112. By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties pursuant to CWA Sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

113. An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff for which harm it has no plain, speedy, or adequate remedy at law.

114. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## FOURTH CAUSE OF ACTION

### Failure to Develop and Implement Adequate Stormwater Monitoring Program, In Violation of the General Permit

115. Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

116. Defendant has discharged and continues to discharge pollutants from the Facility in violation of the General Permit. Defendant is also in violation of the General Permit for repeated failure to report proper semiannual DMRs as required by the General Permit. Thus, Defendant's discharges constitute an unpermitted discharge of pollutants from the Facility to waters of the United States in violation of CWA Section 301(a), 33 U.S.C. § 1311(a).

117. Defendant has been in violation of CWA Section 301(a) every day it has discharged stormwater from the Facility to waters of the United States since July 23, 2023. Defendant will continue to be in violation of the CWA each day that unpermitted stormwater discharges from the

Facility to waters of the United States.

118. By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365.

119. An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff for which harm it has no plain, speedy, or adequate remedy at law.

120. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

**RELIEF REQUESTED**

Plaintiff respectfully requests this Court to grant the following relief:

A. Declare Defendant to have violated and to be in violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent limitations which include the Best Available Technology Economically Achievable and Best Conventional Pollutant Control Technology requirements, and for failing to comply with the substantive and procedural requirements of the General Permit;

B. Enjoin Defendant from discharging pollutants from the Facility to stormwater discharge points, which discharge to the Unnamed Tributary East Branch Croton, Croton River, New Croton Reservoir, the Hudson River, and the overall Hudson River Watershed;

C. Order Defendant to restore all receiving waters damaged by Defendant's illegal discharges of pollutants from the Facility;

D. Enjoin Defendant from violating Sections 301(a) and (b) and Section 402(p) of the Clean Water Act and from violating the substantive and procedural requirements of the General

Permit at the Facility;

E. Order Defendant to pay civil penalties of up to $68,445.00 per day per violation for violations occurring after November 2, 2015 and where penalties are assessed on or after January 8, 2025. 33 U.S.C. § 1319(d), 40 C.F.R. §§ 19.1-19.4;

F. Award Plaintiff its costs (including reasonable attorney, witness, and consultant fees) as authorized by the CWA Section 505(d), 33 U.S.C. § 1365(d);

G. Award such other relief as this Court may deem appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: September 24, 2026

**BRODSKY SMITH**

By: Evan J. Smith

Evan J. Smith
240 Mineola Boulevard
Mineola, NY 11501
Phone: (516) 741-4977
Facsimile (561) 741-0626

*Attorneys for Plaintiff*